# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued May 9, 2006            Decided June 9, 2006

No. 05-7060

PAMELA H. ROTH, ET AL.,
APPELLEES

v.

RUFUS G. KING, III,
AS CHIEF JUDGE OF THE
SUPERIOR COURT OF THE DISTRICT OF COLUMBIA, ET AL.,
APPELLANTS

HERB ROBINSON,
AS DIRECTOR OF THE OFFICE OF ADMINISTRATION
FOR THE CRIMINAL JUSTICE ACT, ET AL.,
APPELLEES

---

Consolidated with
05-7061, et al.

---

Appeals from the United States District Court
for the District of Columbia
(No. 03cv01109)

---

*Donald B. Verrilli, Jr.* argued the cause for appellants/cross-appellees Rufus G. King, III, et al.  With him on the briefs was *Robin M. Meriweather*.

*Donald T. Stepka* argued the cause for appellants/cross-appellees Herb Robinson, et al.  With him on the briefs were *Ronald A. Schechter* and *Jonathan L. Stern*.

*Lois R. Goodman* argued the cause for appellees/cross-appellants.  With her on the briefs were *David J. Ontell*, *David J. Sitomer*, and *Betty J. Clark*.

Before: SENTELLE and BROWN, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

EDWARDS, *Senior Circuit Judge*:  In the 2002 Appropriations Act for the District of Columbia, a joint congressional committee issued a statement "strongly urg[ing] the D.C. Superior Court to evaluate the quality of the legal services rendered by lawyers appointed under the Criminal Justice Act to handle juvenile delinquency cases." 147 CONG. REC. H8926 (daily ed. Dec. 5, 2001).  The court was "urged to take immediate, affirmative steps to ensure that lawyers who lack the requisite training, experience and skill are not appointed to delinquency cases." *Id.*  Responding to that directive, Chief Judge Rufus G. King, III, of the Superior Court of the District of Columbia ("Superior Court"), appointed an *ad hoc* committee to recommend panels of qualified attorneys to represent indigent parties in Family Court. From among the 351 applications received, the committee ultimately recommended 75 attorneys for a juvenile delinquency panel, 77 attorneys for a guardian *ad litem* panel, 181 attorneys for the Counsel for Child Abuse and Neglect ("CCAN") panel, and 34 special education advocates. On March 26, 2003, after reviewing the committee's report, Chief Judge King issued Administrative Order 03-11 ("AO 03-

11"), which established the Family Court Attorney Panels in accordance with the committee's recommendations.

Prior to the establishment of the Family Court Attorney Panels, the Superior Court did not designate attorneys for such panels. Rather, the Court simply appointed counsel from lists of volunteers that had been maintained by the CCAN Office or the D.C. Public Defender Service ("PDS"). Any lawyer who desired to be on the volunteer lists was included, without any inquiry into the lawyer's qualifications. Lawyers on the lists were not guaranteed any appointments, however. Inclusion merely indicated to Superior Court judges that a lawyer was interested in receiving appointments. This regime was changed with the issuance of AO 03-11. The order provided, *inter alia*, that, in most cases, judges in Family Court must appoint attorneys from the appropriate panel list to represent indigent parties. Non-Panel attorneys may continue to represent their clients, but they are not eligible to receive compensation under the Criminal Justice Act ("CJA"), D.C. CODE §§ 11-2601 *et seq.* (2001), or the CCAN statute, D.C. CODE § 16-2326.01.

On May 21, 2003, plaintiffs-appellees, who claim to represent a class of attorneys who allegedly suffered harm as a result of AO 03-11, filed suit in District Court against the judges of the Superior Court who participated in developing and implementing the panel system ("Superior Court appellants"), and also against Ronald S. Sullivan, Jr., then-Director of PDS, and Herbert C. Robinson, Chief of PDS's Defender Services Office (collectively "PDS appellants"). Appellees alleged, *inter alia*, that they had a "property interest" in their "specialty practice" in Family Court, and that AO 03-11 violated their Fifth Amendment rights by "taking" their property without due process.

The Superior Court and PDS appellants filed motions to dismiss on several grounds, including immunity from suit and appellees' failure to allege a constitutionally protected property

interest. The District Court granted the motion as to appellees' claims for money damages. *Roth v. King*, CA No. 03-1109, Mem. Op. (D.D.C. Mar. 11, 2005), Joint Appendix ("J.A.") 79. The District Court declined to dismiss appellees' claims for injunctive and declaratory relief, however, because, *inter alia*, in the court's view, it was unclear "whether the plaintiffs have a property interest in their specialty practice of law." *Id.* at 17, J.A. 95.

On April 11 and 19, 2005, Superior Court and PDS appellants, respectively, filed appeals seeking collateral order review of the District Court's denial of immunity with respect to appellees' claims for injunctive relief. They also filed motions for certificates of appealability pursuant to 28 U.S.C. § 1292(b) (2000) to seek review of the District Court's order denying their motions to dismiss appellees' Fifth Amendment claims and to stay all proceedings. The District Court granted these motions on April 21, 2005, and this court granted the petitions to appeal on July 29, 2005. Meanwhile, on April 25, 2005, appellees filed a "cross-appeal" seeking to challenge the District Court's dismissal of their claims for damages. Appellees did not move for a certificate of appealability on these claims, nor did they file a cross-petition under Federal Rule of Appellate Procedure 5(b)(2).

We agree with appellants that the District Court erred in failing to dismiss appellees' Fifth Amendment claims. We hold that appellees have no "property interest" in their "specialty practice" in the Family Court, and that AO 03-11 resulted in no unlawful "takings." We also hold that the District Court erred in finding that judicial immunity covers only damages. Finally, we decline to reach the additional issues purportedly raised by appellees on "cross-appeal," because those matters are not properly before this court.

## I. Background

### A. Family Court Appointed Counsel

D.C. Code §§ 16-2301 *et seq.* (2001), which regulates the Family Court Division of the Superior Court, guarantees appointed counsel to parties who cannot afford adequate representation. Section 16-2304(a) gives "[a] child alleged to be delinquent or in need of supervision" the right to counsel "at all critical stages of [Family Court] proceedings," and guarantees that, "[i]f the child and his parent, guardian, or custodian are financially unable to obtain adequate representation, the child shall be entitled to have counsel appointed for him in accordance with rules established by the Superior Court." D.C. Code § 16-2304(a). These provisions work in tandem with the CJA, which reaffirms the right of juveniles who are alleged to be delinquent or in need of supervision to counsel. Section 11-2604 of the CJA establishes the hourly rates for attorneys in juvenile cases, and § 16-2326.01 provides that attorneys serving as counsel or guardians *ad litem* in neglect proceedings are compensated at the same rate. Of particular importance to this case, the CJA also specifies that "[c]ounsel furnishing representation . . . shall in every case be selected from panels of attorneys designated and approved by the courts." D.C. Code § 11-2602.

As noted above, prior to the establishment of the Family Court attorney panel system at issue, Superior Court judges appointed counsel in Family Court matters from lists of volunteers maintained by the CCAN Office or PDS. Attorneys were allowed to add their names to these lists without any inquiry into their qualifications. Inclusion on the lists did not guarantee appointments, however. Rather, it merely indicated that a lawyer was interested in being considered for appointment.

6

On April 26, 2002, Chief Judge King issued Administrative Order 02-15, creating the Family Court Panels Committee ("Committee") "for the purpose of creating panels of attorneys for representation of indigents in Family Court proceedings." Administrative Order No. 02-15, Superior Court of D.C. (Apr. 26, 2002), at 3, J.A. 120. The order instructed the Committee, in consultation with the presiding and deputy presiding judges of the Family Court, to recommend panels of designated and approved attorneys to represent four categories of indigent parties: (1) juveniles alleged to be delinquent or in need of supervision, (2) minor children needing guardians *ad litem* in neglect and termination proceedings, (3) parents and caretakers in neglect and termination proceedings, and (4) children needing special education advocates. This order was issued in part in response to a call by a joint congressional committee for the Superior Court to "'evaluate the quality of the legal services rendered by lawyers appointed under the Criminal Justice Act to handle juvenile delinquency cases . . . [and] to take immediate, affirmative steps to ensure that lawyers who lack the requisite training, experience and skill are not appointed to delinquency cases.'" Administrative Order 03-11, Superior Court of D.C. (Mar. 26, 2003), at 1 (quoting 147 CONG. REC. H8926 (daily ed. Dec. 5, 2001)), J.A. 101.

The Committee initiated an application process on July 18, 2002, and interested attorneys were directed to submit their applications by October 1, 2002 (later extended to November 1, 2002). The application form required applicants to detail, *inter alia*, their educational background, previous experience in Family Court, current caseload, methods of client management, whether they had recently attended legal education programs, and other information about their professional background and experience. *See* Report of the Family Court Panels Committee (Mar. 20, 2003), at 5-6, J.A. 126-27 ("Committee Report"). After applications were received, all active, senior, and

magistrate judges of the Superior Court were asked to evaluate each applicant with whom they were familiar.

The Committee held its selection meetings in February and March 2003. After reviewing all of the applications and accompanying evaluations, the Committee then formulated its recommendations. Any attorney who was deemed qualified was placed on an appropriate Family Court Attorney Panel list. There was no limit on the number of attorneys who could be deemed qualified, and there was no limit on the number of panels on which an attorney might be listed. From the 351 applications received, the Committee ultimately selected 75 attorneys for the juvenile delinquency panel, 77 attorneys for the guardians *ad litem* panel, 181 attorneys for the CCAN panel, and 34 special education advocates. The Committee Report explained:

> Some attorneys were excluded from a panel because their work . . . was found to be deficient. Others, however, were excluded, particularly from the [guardians *ad litem*] panel, because they lacked sufficient experience, because judicial officers had insufficient information about the quality of their work, or because they had not previously demonstrated a commitment to the work of the panel to which they applied. Many of these applicants may be outstanding additions to the panels in the future if they obtain appropriate experience and/or training.

*Id.* at 9, J.A. 130.

On March 26, 2003, after reviewing the Committee Report, Chief Judge King issued AO 03-11, which established the Family Court Attorney Panels in accordance with the Committee's recommendations. The order provided that, barring "exceptional circumstances," if an attorney is seeking compensation under either the CJA or the Child Abuse and Neglect Act, Superior Court judicial officers may only appoint

that individual if he or she is listed on the appropriate panel. In addition, AO 03-11 mandated that all nonqualifying CCAN-compensated guardians *ad litem* in current neglect and termination of parental rights cases should be replaced with panel attorneys within six months, unless the presiding judge determines in his or her discretion that substitution would not be in the best interest of the child.

## B. District Court Proceedings

On May 21, 2003, appellees filed their initial complaint, along with a motion for a temporary restraining order ("TRO") seeking to enjoin appellants from applying AO 03-11. After the District Court denied appellees' TRO request on June 2, 2003, they filed an amended complaint, which was amended a second time on April 30, 2004. In their Second Amended Complaint, appellees defined the putative plaintiff class as "court-appointed attorneys who have represented in the past three years, are representing, or are otherwise eligible to represent clients in the Family Court of the District of Columbia." Second Am. Compl. ¶ 33, J.A. 54. Appellees' complaint challenged the Superior Court's panel system principally on the ground that it abridges their purported constitutional right to receive paid Family Court appointments. Specifically, appellees alleged that they have a "property interest in their existing practice before [the] Family Court," and that the panel system violates the Fifth Amendment by "taking" this "property without due process." *Id.* at Count I, ¶ 113, J.A. 60, 74. Among the 16 counts listed in their complaint, appellees also raised an array of constitutional, statutory, and common law challenges. The complaint seeks monetary damages as well as injunctive and declaratory relief.

On June 1, 2004, appellants filed motions to dismiss all of appellees' claims pursuant to Federal Rules of Civil Procedure 12(b)(1) and (b)(6). In their motions for dismissal, both Superior Court and PDS appellants asserted, *inter alia*, that they were immune from liability as a result of their roles in creating

the four panels, and moreover, that appellees' Fifth Amendment Takings/Due Process claims failed to state a cause of action. The District Court granted in part and denied in part these motions to dismiss on March 11, 2005.

The District Court found that "the creation of the panel system and the limitation of appointments to panel attorneys was a legislative act," Mem. Op. at 7, J.A. 85, making those appellants who helped establish the Family Court panel framework legislatively immune from all forms of relief. The court found that appellants who participated in the selection of various attorneys for panel membership were entitled to a more limited "judicial" immunity, which the District Court found to bar damages, but not injunctive or declaratory relief. *Id.* at 9, J.A. 87. The District Court also determined that this judicial immunity covered PDS appellants, because their "'duties are related to the judicial process.'" *Id.* at 17, J.A. 95 (quoting *Barr v. Mateo*, 360 U.S. 564, 569 (1959)).

The District Court expressed confusion over the odd construction of appellees' complaint alleging a "Fifth Amendment taking of property without due process." *Id.* at 10, J.A. 88. Nonetheless, relying principally on *Family Division Trial Lawyers Ass'n v Moultrie*, 725 F.2d 695 (D.C. Cir. 1984), the District Court concluded that, "[a]t this point in the litigation, the court cannot say that the plaintiffs do not have a property interest in a specialty practice of law in the Family Division." Mem. Op. at 12, J.A. 90.

Near the conclusion of its Memorandum Opinion granting in part and denying in part appellants' motion to dismiss, the District Court disposed of two arguments raised by appellees challenging the efficacy of the Superior Court Family Court Attorney Panels. The court first held that the panel system was not *ultra vires*. On this point, the court found that D.C. Code §§ 11-2602 and 16-2304(a) combine to give the Superior Court authority "to make rules governing the appointment of counsel."

Mem. Op. at 14-15, J.A. 92-93. The court then rejected appellees' claim that AO 03-11 unconstitutionally interfered with the attorney-client relationship, noting that appellees had "presented no persuasive authority or argument that an *attorney* has a right to maintain a relationship with a client and that a court may not interfere with that right." *Id.* at 16, J.A. 94 (emphasis added).

On April 11 and 19, 2005, Superior Court and PDS appellants, respectively, filed motions for certification under 28 U.S.C. § 1292(b) to appeal the District Court's denial of their motions to dismiss appellees' Fifth Amendment claims. Appellants also filed timely notices of appeal to seek collateral order review of the District Court's denial of immunity with respect to appellees' claims for injunctive relief. On April 21, 2005, the District Court granted appellants' motions for certification, and on July 29, 2005, this court granted appellants permission to appeal pursuant to 28 U.S.C. § 1292(b). Appellees' filed a "cross-appeal" on April 25, 2005, challenging the District Court's ruling that appellants were immune from damages. Appellees never sought certification under 28 U.S.C. § 1292(b) to seek review of the District Court's partial grant of appellants' motion to dismiss affording appellants legislative and judicial immunity against appellees' claims for damages. Nor did appellees file a cross-petition under Federal Rule of Appellate Procedure 5(b)(2) to appellants' petitions for permission to appeal the District Court's denial of their motion to dismiss appellees' Fifth Amendment claims.

## II. ANALYSIS

### A. Jurisdiction

The District Court had jurisdiction over appellees' Fifth Amendment claims pursuant to 28 U.S.C. § 1331 (2000). This court accepted jurisdiction pursuant to 28 U.S.C. § 1292(b) to allow an interlocutory appeal of the District Court's refusal to

dismiss appellees' Fifth Amendment claims. And this court has jurisdiction under the collateral order doctrine to review the District Court's denial of appellants' immunity claims, because those claims turn on issues of law. *See Int'l Action Ctr. v. United States*, 365 F.3d 20, 23 (D.C. Cir. 2004) (explaining the "collateral order doctrine" under *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541 (1949), with respect to interlocutory appeals from denials of immunity).

On January 9, 2006, instead of filing a reply brief, appellees filed a "motion to remand the case back to the district court due to lack of jurisdiction." Unconsented Mot. to Remand the Case Back to the District Court Due to Lack of Jurisdiction ("Remand Mot.") at 1. In support of this motion, appellees asserted that their complaint sought a monetary claim against the Superior Court, which appellees contend is a *federal court* because Congress created it pursuant to its Article I powers. *See id.* at 1-2. Appellees therefore claimed that the Federal Circuit has exclusive jurisdiction over this appeal. *See id.* at 1 (citing 28 U.S.C. § 1295(a)(2) (2000)). Appellees also argued that the District Court's jurisdiction was "questionable," because appellees have not clearly waived their claims to damages in excess of $10,000 and, therefore, the Court of Federal Claims might have exclusive original jurisdiction over their claims. *See id.* at 2 (citing 28 U.S.C. § 1346). Accordingly, appellees requested that this case be remanded to the District Court, so that it could vacate its judgment and transfer the case to the Court of Federal Claims or, in the alternative, permit appellees to amend their claims to specify that they are not seeking damages in excess of $10,000. *See id.* at 2. The motion to remand was referred to this merits panel. We now deny the motion.

Appellees' jurisdictional arguments are founded on faulty premises. Section 1295(a)(2) provides that the Federal Circuit shall have exclusive jurisdiction of an appeal from a final

decision of a district court "if the jurisdiction of that court was based, in whole or in part, on section 1346 of this title." 28 U.S.C. § 1295(a)(2). Section 1346 delineates trial court jurisdiction in cases where money damages are sought from the United States. *See* 28 U.S.C. § 1346. In particular, § 1346 provides in pertinent part that the district courts shall have original jurisdiction, concurrent with the Court of Federal Claims, of "[a]ny . . . civil action or claim against the United States, not exceeding $10,000 in amount, founded either upon the Constitution, or any Act of Congress . . . or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1346(a)(2). Appellees believe that § 1346 applies here, because they are seeking monetary damages from the Superior Court, which they argue should be treated as the United States. This claim is meritless.

Although the Superior Court is a "federal" creation, the "case law and other federal statutes [generally] treat the D.C. courts like state courts." *Handy v. Shaw, Bransford, Veilleux & Roth*, 325 F.3d 346, 351 n.5 (D.C. Cir. 2003); *see also JMM Corp. v. District of Columbia*, 378 F.3d 1117, 1125 (D.C. Cir. 2004) ("Congress has made clear that it intends federal courts generally to treat the District of Columbia judicial system as if it were a state system, an intent that this circuit has long respected and effectuated."). We can find no authority, and appellees cite none, supporting the suggestion that, although it is "like state courts" for most purposes, the Superior Court should be treated as the "United States" for purposes of 28 U.S.C. § 1346. We therefore reject the suggestion. And because appellees' complaint plainly is not a suit against the United States, there is no merit to their suggestion that the Court of Federal Claims has exclusive original jurisdiction because appellees did not expressly waive damages in excess of $10,000.

It is also clear that the judges of the Superior Court and officials at PDS are not the "United States" for purposes of the

Tucker Act. *See* 28 U.S.C. § 1491(a)(1) (2000) ("The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States . . . ."). Indeed, the "Tucker Act grants the Court of Federal Claims jurisdiction over suits against the United States, *not* against individual federal officials. 28 U.S.C. § 1491(a)." *Brown v. United States*, 105 F.3d 621, 624 (Fed. Cir. 1997) (emphasis added).

In short, as noted above, the District Court had jurisdiction under § 1331 to hear appellees' Fifth Amendment claims, and this court has jurisdiction under § 1292(b) and the collateral order doctrine to entertain the appeals that are now properly before us.

**B.  The Issues on Appeal**

This case is laden with multiple claims and a convoluted record. It is therefore important that we carefully draw the bounds of this interlocutory appeal, lest there be any confusion over what is now before this court. There are only two issues now on appeal: (1) appellants' claim that the District Court erred in denying their motion to dismiss appellees' Fifth Amendment claims; and (2) appellants' claim that the District Court erred in concluding that they were not entitled to immunity against appellees' claims for injunctive relief. There are no other issues before this court at this time.

Appellees purported to file a "cross-appeal" challenging the District Court's ruling that appellants were "immune from suit and liability on Plaintiffs' claims." *See* Notice of Cross-Appeal, *Roth v. King*, CA No. 03-1109 (D.D.C. Apr. 25, 2005). Principally, appellees seek to give life to their claims for damages against appellants, which the District Court dismissed as barred by legislative and judicial immunity. But the District

Court dismissal of these claims did not result in a "final decision" for purposes of 28 U.S.C. § 1291, *see Hill v. Henderson*, 195 F.3d 671, 672 (D.C. Cir. 1999), and appellees did not seek certification under 28 U.S.C. § 1292(b).  Nor do appellees satisfy the requirements of the collateral order doctrine.  We agree with our sister circuits, which have uniformly held that an order *granting* immunity "does not satisfy the collateral order doctrine and may not be immediately appealed."  *Baird v. Palmer*, 114 F.3d 39, 43 (4th Cir. 1997) (citing cases).  It is also noteworthy that the District Court did not certify its dismissal as final under Federal Rule of Civil Procedure 54(b).  *See Hill*, 195 F.3d at 672.

Moreover, appellees did not file a cross-petition for permission to appeal after Superior Court appellants sought permission to appeal the District Court's refusal to dismiss appellees' Fifth Amendment claims.  *See* FED. R. APP. P. 5(b)(2) (stating that "[a] party may file . . . a cross-petition within 7 days after the [initial] petition is served"). In light of appellees' failure to timely file this cross-petition – or any at all, for that matter – it is unclear whether we even have discretion to consider the issues presented by appellees' "cross-appeal."

In *Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199 (1996), the Court noted:

> As the text of § 1292(b) indicates, appellate jurisdiction applies to the *order* certified to the court of appeals, and is not tied to the particular question formulated by the district court. The court of appeals may not reach beyond the certified order to address other orders made in the case. *United States v. Stanley*, 483 U.S. 669, 677 (1987).  But the appellate court may address any issue fairly included within the certified order because "it is the order that is appealable, and not the controlling question identified by the district court." 9 J. Moore & B. Ward, Moore's Federal Practice ¶ 110.25[1], p. 300 (2d ed.1995).  See also 16 C. Wright, A.

Miller, E. Cooper, & E. Gressman, Federal Practice and Procedure § 3929, pp. 144-145 (1977) ("[T]he court of appeals may review the entire order, either to consider a question different than the one certified as controlling or to decide the case despite the lack of any identified controlling question.").

*Id.* at 205. Although *Yamaha* makes it clear that we "*may* address any issue fairly included within the certified order," it does not address how § 1292(b) should be read in conjunction with Rule 5(b)(2) of the Federal Rules of Appellate Procedure. Appellees' challenge to the District Court's order dismissing their damage actions as barred by legislative and judicial immunity arises from the same order denying appellants' motion to dismiss appellees' Fifth Amendment claims. It therefore "applies to the order certified" for review under § 1292(b)(2). But the challenge also appears to be a "cross-petition" within the compass of Rule 5, which must be timely filed, and for which permission to seek review must be given. Even if appellees' "Notice of Cross-Appeal" is viewed as a "cross-petition," we did not grant permission for such an appeal, and appellees' Notice of Cross-Appeal was filed 14 days after Superior Court appellants' petition was served on the clerk of the District Court. At least one other circuit has maintained that "[t]he failure to file [a] petition for permission to cross-appeal within the time provided is a jurisdictional defect, *barring* th[e] Court from hearing [appellee]'s cross-appeal." *Tranello v. Frey*, 962 F.2d 244, 247-48 (2d Cir. 1992) (emphasis added). *But cf. Freeman v. B & B Assocs.*, 790 F.2d 145, 151 (D.C. Cir. 1986) (holding that failure of an appellee to cross-appeal "ordinarily precludes review where an appellee seeks to enlarge his rights or lessen those of an adversary," but is not a jurisdictional bar).

We need not resolve these knotty issues raised in connection with § 1292(b) and Rule 5. The one thing that is clear here is that any review of appellees' purported cross-

appeal is at most discretionary with this court. Given the record at hand, we decline to exercise any discretion that we might have to engage in interlocutory review of the District Court's order denying appellees' claims for damages. As appellants point out, appellees "have not even argued, let alone shown, that these claims warrant interlocutory review." Reply & Opp'n Br. of Appellants Superior Court Judges at 15. Absent such a showing, there is no good reason for this court to entertain appellees' cross-appeal on damages. Moreover, we similarly decline to resolve whether the cross-appeal is so "inextricably intertwined" as to allow for pendent appellant jurisdiction in this case. *See Swint v. Chambers County Comm'n*, 514 U.S. 35, 50-51 (1995); *Gilda Marx, Inc. v. Wildwood Exercise, Inc.*, 85 F.3d 675, 678-79, 679 n.4 (D.C. Cir. 1996) (per curiam).

We therefore turn to the two issues that are properly before this court: (1) appellees' Fifth Amendment claims and (2) appellants' claims that they are entitled to immunity against injunctive relief.

## C.  Appellees' Fifth Amendment Claims

This court reviews *de novo* the District Court's denial of appellants' motions to dismiss appellees' Fifth Amendment claims. *See Covad Commc'ns Co. v. Bell Atl. Corp.*, 398 F.3d 666, 670-71 (D.C. Cir. 2005); *Bombardier Corp. v. Nat'l R.R. Passenger Corp.*, 333 F.3d 250, 252 (D.C. Cir. 2003). In concluding that appellees "may be able to demonstrate that they have a property interest in their specialty practice of family law," Mem. Op. at 13, J.A. 91, the District Court relied primarily on *Family Division Trial Lawyers Ass'n v. Moultrie. Id.* at 12-13, J.A. 90-91. We find that the District Court erred in reaching this conclusion, for *Moultrie* plainly does not control the disposition of this case. We also hold that appellees' Fifth Amendment claims fail to state a cause of action and, therefore, must be dismissed.

The court in *Moultrie* considered a constitutional claim brought by Superior Court Family Division trial attorneys "that requiring an attorney to perform traditional *pro bono* service amounts to a 'taking' of property." *Moultrie*, 725 F.2d at 705. In the course of the opinion, the court said: "if the superior court appointment system effectively denies the appellants the opportunity to maintain a remunerative practice as family lawyers before the Family Division, and that specialty practice is determined to be a 'property' interest, it might effect an unconstitutional 'taking.'" *Id.* at 706. Appellees' attempt to rest on this passage from *Moultrie* to build a claim here that they have a "property interest" in their "specialty practice" in Family Court, and that AO 03-11 violated their Fifth Amendment rights by "taking" their property without due process. Appellees' arguments on this score are specious.

Not only does *Moultrie* not support appellees' Fifth Amendment claims in this case, parts of the decision positively refute their principal contentions. As a preliminary matter, it should be noted that *Moultrie* addressed an equal protection claim under the Fifth Amendment. Appellees in this case have raised no such claim. More importantly, the court in *Moultrie* made it absolutely clear that the trial attorneys in the Family Division of Superior Court "[had] no expectation of compensation for their services in appointed cases that rises to the level of a property interest." *Id.*

Finally, and most importantly, the court's concern in *Moultrie* was not that the attorneys' expectations of compensated appointments might rise to the level of a property interest. Rather, the court was concerned that the system at issue in that case – which required attorneys to accept abuse and neglect cases *pro bono* in order to receive compensated juvenile cases – might amount to an unlawful "taking" if the burden of the mandatory *pro bono* assignments prevented lawyers from earning a living. The court thus said:

> While we agree . . . that some *pro bono* requirements do not constitute a "taking," we think it equally clear that an unreasonable amount of required uncompensated service might so qualify.
>
> . . . .
>
> Of course, the state, in the reasonable exercise of its police power, may frustrate even expectations that rise to the level of a property interest. But that is not what is involved here. Here, . . . the government is not merely contracting for employees' services which it is free to use or to decline, but rather is *allegedly appropriating for itself in the existing market the services of certain lawyers to a degree that their economic survival in that market is threatened* . . . .

*Id*. at 705, 706 n.13 (internal citations omitted) (emphasis added).

It seems obvious that nothing about the Family Court attorney panel system promulgated pursuant to AO 03-11 resembles the "conscripted" *pro bono* service requirement at issue in *Moultrie*. Appellants are quite correct in their argument that "[t]he instant case simply does not implicate the *Moultrie* 'takings' analysis upon which the Family Lawyers' Fifth Amendment claims depend. The Family Lawyers do not, and cannot, allege that their time or labor has been appropriated." Resp. & Reply Br. of PDS Appellants at 5. It is also clear that "AO 03-11 neither expropriates any of [appellees'] labor nor imposes a regulatory burden or restriction on them of any kind." Br. of Superior Court Appellants at 19. In other words, the government is not "appropriating itself . . . the services of certain lawyers." *Moultrie*, 725 F.2d at 706 n.13. Instead, "[t]he Superior Court is merely deciding the rules that will govern how it will retain and compensate lawyers in fulfillment of the government's statutory responsibility to ensure that

indigents in Family Court matters receive effective representation." Br. of Superior Court Appellants at 19. In short, *Moultrie* cannot possibly carry the day for appellees.

The only remaining questions here are whether appellees have otherwise alleged a viable "property interest" protected by the Fifth Amendment Due Process Clause or, alternatively, stated a claim that is cognizable under the Takings Clause of the Fifth Amendment. We are not entirely sure what appellees mean when they contend that AO 03-11 constitutes a "Fifth Amendment taking of property without due process." Second Am. Compl. Count I, J.A. 60. We need not tarry over this point, however. Accepting appellees' allegations as true, we find no valid property interest under either the Due Process Clause or the Takings Clause of the Fifth Amendment. The District Court therefore erred in allowing these claims to survive appellants' motion to dismiss.

It is well understood that, under the Fifth Amendment Due Process clause, "[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire and more than a unilateral expectation of it. He must, instead have a legitimate claim of entitlement to it." *Town of Castle Rock v. Gonzales*, 125 S. Ct. 2796, 2803 (2005) (citation and internal quotation marks omitted). Property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972); *see also Bloch v. Powell*, 348 F.3d 1060, 1068 (D.C. Cir. 2003). And "federal constitutional law determines whether [a claimed property] interest rises to the level of a legitimate claim of entitlement protected by the Due Process Clause." *Castle Rock*, 125 S. Ct. at 2803-04 (citations, alteration, and quotation marks omitted).

Appellees have cited no source of law creating any entitlement that qualifies as property under the Due Process

Clause. There was no statute, regulation, or court rule that guaranteed any member of the bar compensated Family Division appointments before AO 03-11 was promulgated. As noted above, the judges of the Superior Court always had discretion to decide which attorneys to appoint to handle Family Division cases, and to decide the basis upon which such appointments would be made. Section 11-2602 of the D.C. Code provides that "[c]ounsel furnishing representation . . . shall in every case be selected from panels of attorneys designated and approved by the courts." D.C. CODE § 11- 2602. Prior to the adoption of AO 03-11, no law or rule ensured appointment for attorneys who met particular criteria, and no law or rule restricted the discretion of a presiding judge to terminate a lawyer's appointment for cause. The Superior Court simply appointed counsel from lists of volunteers that had been maintained by the CCAN Office and PDS. Any lawyer who desired to be on a volunteer list was included, without any inquiry into the lawyer's qualifications. However, inclusion on a list merely indicated to Superior Court judges that a lawyer was interested in receiving appointments – it did not guarantee appointment. In short, before the issuance of AO 03-11, no member of the bar could claim entitlement to appointments in the Family Division.

"[W]hen a statute leaves a benefit to the discretion of a government official, no protected property interest in that benefit can arise." *Bloch*, 348 F.3d at 1069; *see also Castle Rock*, 125 S. Ct. at 2803 (noting that "a benefit is not a protected entitlement if government officials may grant or deny it in their discretion"); *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 462-63 (1989) (stating that protected liberty interests are created when a state places substantive limitations on official discretion). This point was made clear in *Washington Legal Clinic for the Homeless v. Barry*, 107 F.3d 32 (D.C. Cir. 1997), where we held that D.C. law and regulations defining eligibility for emergency shelter for homeless persons did not create a property interest, because government officials retained

substantial discretion to determine which eligible persons would actually receive shelter. *Id.* at 36-37. "Where . . . the legislature leaves final determination of which eligible individuals receive benefits to the unfettered discretion of administrators, no constitutionally protected property interest exists." *Id*. at 36 (citation and internal quotation marks omitted).

Under this well-established case law, appellees' desires for compensated appointments amount to nothing more than "expectations," not "entitlements." There never has been a statute or rule, or even a practice, securing to attorneys a right to compensated Family Court appointments. And "[a] lawyer's inability to make a living as a family court practitioner without such appointments does not remotely create an entitlement." Br. for Superior Court Judge Appellants at 20. Therefore, appellees have alleged no facts sufficient to support any claim under the Due Process Clause.

Appellees' claims under the Fifth Amendment Takings Clause fare no better. As appellants aptly note, "the invalidity of a takings claim follows *a fortiori* from [appellees'] failure to establish any entitlement that would qualify as property under the Due Process Clause. That is so because even a legitimate claim of entitlement to a benefit that is sufficient to trigger due process protection does not transform the benefit itself into a vested property right protected by the Takings Clause. *See generally Kizas v. Webster*, 707 F.2d 524, 539-40 (D.C. Cir. 1983)." Br. of Superior Court Judge Appellants at 16-17. The decision in *Kizas* notes that "the fifth amendment employs two independent clauses to address two independent issues. A claim of *deprivation* of property without due process of law cannot be blended as one and the same with the claim that property has been *taken* for public use without just compensation." *Id.* at 539 (citation, quotation marks, and alteration omitted).

Furthermore, "[e]ven if the District of Columbia had established an entitlement on the part of [appellees] to

compensated Family Division appointments (and it assuredly has not), the Takings Clause would not constrain the government's authority to alter or eliminate that entitlement." Br. of Superior Court Judge Appellants at 17 (citing, *inter alia*, *Bowen v. Gilliard*, 483 U.S. 587, 604 (1987) ("Congress is not, by virtue of having instituted a social welfare program, bound to continue it at all, much less at the same benefit level.")). "Generally, when a government entity acts to create property rights yet retains the power to alter those rights, the property right is not considered 'private property,' and the exercise of the retained power is not considered a 'taking' for Fifth Amendment purposes." *Democratic Cent. Comm. of D.C. v. Washington Metro. Area Transit Comm'n*, 38 F.3d 603, 606 (D.C. Cir. 1994) (per curiam). "[T]he very notion that AO 03-11 'takes' [appellees'] property is beset by such difficulties that it is impossible to see how the concept could apply in practice." Br. of Superior Court Judge Appellants at 17. Appellees have stated no Takings claims that can withstand appellants' motions to dismiss.

In sum, we hold that appellees have not stated a claim for relief under either the Due Process or Takings Clauses of the Fifth Amendment. They have demonstrated no entitlements or "property interests" that warrant mandatory process or just compensation. We therefore reverse the District Court on this point.

## D. Immunity

### 1. *Superior Court Appellants*

We agree with Superior Court appellants that the District Court erred in holding that appellees might be able to obtain injunctive relief. 42 U.S.C. § 1983, as amended in 1996 by the Federal Courts Improvement Act, explicitly immunizes judicial officers against suits for injunctive relief. The statute states that, "in any action brought against a judicial officer for an act or

omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable." Federal Courts Improvement Act of 1996, Pub. L. No. 104-317, § 309(c), 110 Stat. 3847, 3853 (codified as amended at 42 U.S.C. § 1983 (2000)). Neither statutory limitation appears to apply in this case, and appellees' complaint says nothing to the contrary. Therefore, because a number of the Superior Court appellants acted in a "judicial capacity" in selecting attorneys for inclusion on the panels, those appellants are immune from suits for injunctive relief under § 1983.

Citing *Forrester v. White*, 484 U.S. 219 (1988), appellees argue that the creation of the panels and appointment of attorneys are "administrative" acts with respect to which no immunity should apply. Appellees' reliance on *Forrester* is misplaced. *Forrester* concerned a probation officer's complaint that the chief judge of her circuit unlawfully demoted and discharged her. The Supreme Court found that the chief judge "was acting in an administrative capacity when he demoted and discharged [her]." *Id.* at 229. The Court held that "[t]hose acts – like many others involved in supervising court employees and overseeing the efficient operation of a court – . . . . were not themselves judicial or adjudicative." *Id.* Thus, *Forrester* stands for the unremarkable proposition that internal employment decisions made by judges are not judicial acts. Such acts have no relevance to the development and implementation of AO 03-11.

### 2. *PDS Appellants*

As the District Court noted, "[b]y statute, PDS is directed to assist the court in determining the financial eligibility for appointed representation." Mem. Op. at 17, J.A. 95. In addition, D.C. Code § 2-1602(b) (2001), requires PDS to "establish and coordinate the operation of an adequate system of private attorneys to represent [indigent] persons." It is well

established that judicial immunity "extends to other officers of government whose duties are related to the judicial process." *Barr*, 360 U.S. at 569; *see Stanton v. Chase*, 497 A.2d 1066, 1069 (D.C. 1985) (citing *Barr* and holding that the Deputy Chief of the Defender Services Office – then known as the CJA Office of PDS – was absolutely immune from suit for acts associated with appointment of counsel under the CJA). It is beyond question that PDS appellants' statutory role in the panel system is "related to the judicial process," and the District Court therefore properly afforded them judicial immunity. There is also no reason to believe that the Federal Courts Improvement Act of 1996 is restricted to "judges," and thus we find that, due to their statutory role in the selection process, PDS appellants are immune from injunctive relief.

### III. CONCLUSION

For the reasons outlined above, we reverse on the two matters that are presently before this court. We hold that the District Court erred in (1) denying appellants' motion to dismiss appellees' Fifth Amendment claims, and (2) in concluding that appellants were not entitled to immunity against appellees' claims for equitable relief. The case is hereby remanded for further proceedings consistent with this decision.

*So ordered.*